**AFFIDAVIT IN SUPPORT OF AN
APPLICATION UNDER RULE 41 FOR A
WARRANT TO SEARCH AND SEIZE**

I, Brandon Edwards, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property—two cellular telephones which are currently in law enforcement possession, and the extraction from that property of electronically stored information described in Attachment B.

1. I am employed as a Special Agent (SA) with U.S. Immigration and Customs Enforcement (ICE), Homeland Security Investigations (HSI) and have been since September 29 2019. In August 2020, I completed an approximately 22-week training program held at the Federal Law Enforcement Training Center in Glynco, Georgia. I am currently assigned to the HSI Columbus, Ohio Field Office. Prior to becoming an SA with HSI, I was an SA with the National Security Agency (NSA) at Fort Meade, Maryland. Before this, I worked for the Federal Bureau of Investigation (FBI) as an Operations Support Staff (OST).

2. I have participated in narcotics, bulk cash smuggling, alien smuggling, and firearm investigations. These investigations have included interviewing defendants and witnesses, conducting surveillance, controlling informants, and preparing and serving search warrants, as well as serving arrest warrants. I am familiar with narcotics traffickers' methods of operation including the importation, distribution, and transportation of illegal drugs, the collection of money, and money laundering. I am also familiar with various counter-surveillance methods utilized by narcotics traffickers.

3. I am familiar with the operation of illegal drug trafficking organizations in central Ohio. I have led and participated in numerous seizure warrants for various controlled substances, resulting in the seizure of controlled substances, packaging materials, paraphernalia involved in the distribution of controlled substances, large amounts of U.S. currency, cellular telephones, other assets and proceeds derived as a result of illicit activity, drug ledgers, drug customer lists, bank records, receipts, and other documents relating to the importing, transporting, ordering, purchasing, and distributing of controlled substances.

4. Based on my experience and participation with other HSI special agents and state and local partners, in conducting criminal investigations of violations of Title 21 (Controlled Substance Statutes) and Title 19 (Customs Statutes) of the United States Code, I know that narcotics trafficking organizations have developed a number of methods to insulate their illegal activities from law enforcement detection. These methods are common to major narcotics trafficking organizations to varying degrees of sophistication.

5. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

6.

### IDENTIFICATION OF THE DEVICE TO BE EXAMINED

7. The property to be searched includes:

   a) A white Motorola smartphone in a black case found in the possession of Daniel Humberto RODRIGUEZ-Andrade and seized by law enforcement on July 31, 2024 – the day of RODRIGUEZ' arrest (hereinafter referred to as "**DEVICE 1**") and is

2

currently located at the Homeland Security Investigations (HSI) field office in Columbus, Ohio; and

b) A blue Samsung smartphone in a black case found in the middle console of the vehicle being driven by Daniel Humberto RODRIGUEZ-Andrade and seized by law enforcement on July 31, 2024 – the day of RODRIGUEZ' arrest (hereinafter referred to as "**DEVICE 2**") and is currently located at the Homeland Security Investigations (HSI) field office in Columbus, Ohio.

8. The applied-for warrant would authorize the forensic examination of **DEVICE 1** and **DEVICE 2** for the purpose of identifying electronically stored data particularly described in Attachment B.

## PROBABLE CAUSE

9. On or about June 19, 2024, an HSI Source of Information (SOI) and Confidential Informant (CI) with the Central Ohio Drug Enforcement Task Force (CODETF) (hereinafter referred to as "SOI") contacted HSI Columbus. The SOI stated that a Hispanic male known to him as "Casemiro" was responsible for the trafficking of various narcotics within Central Ohio. Law enforcement later identified this unknown subject as Daniel Humberto RODRIGUEZ-Andrade, a citizen of Mexico who has been previously removed from the United States. On or about June 20, 2024, the SOI observed RODRIGUEZ driving a white 2012 Toyota RAV4 bearing Ohio license plate JTD-5058 (hereinafter referred to as the "TARGET VEHICLE"). RODRIGUEZ made contact with the SOI and presented him with a sample of suspected cocaine.

10. On or about July 28, 2024, an HSI Undercover Agent (UCA), the SOI, and RODRIGUEZ conducted a phone call. Throughout the conversation, the SOI translated for the

3

UCA and RODRIGUEZ. RODRIGUEZ informed the UCA that he was in possession of 2,500 grams of black tar heroin and that he would sell it for $80,000 to the UCA. RODRIGUEZ also stated that he was in possession of 500 grams of cocaine.

15. On or about July 31, 2024, at approximately 1241 hours, investigators positioned themselves on the south side of Rosebrook Court in Reynoldsburg, Ohio in an effort to observe RODRIGUEZ as he exited his suspected residence. An investigator observed the TARGET VEHICLE parked in front of unit 158 Rosebrook Court, Reynoldsburg, Ohio.

16. At approximately 1252 hours, the UCA contacted RODRIGUEZ via phone call, and they agreed to meet at the Kroger parking located at 350 East Broad Street, Pataskala, Ohio to complete the drug transaction.

17. At approximately 1315 hours, an investigator observed RODRIGUEZ exit unit 150 and walk towards the parking lot. An investigator observed RODRIGUEZ sitting in the driver's seat of the TARGET VEHICLE. Another investigator observed RODRIGUEZ depart Rosebrook Court at which point surveillance units observed RODRIGUEZ drive without making any stops to the meeting location in the Kroger parking lot.

18. At approximately 1340 hours, RODRIGUEZ, the SOI, and the UCA made contact in the Kroger parking lot. The UCA observed four taped bundles in a blue drawstring bag. There was one larger bundle and three smaller bundles. RODRIGUEZ informed the UCA that the bundles contained 2,500 grams of black tar heroin. The UCA agreed to purchase the narcotics for $80,000. The UCA then departed the location under the guise of retrieving the money for the transaction.

19. At approximately 1346 hours, RODRIGUEZ left the parking lot in the TARGET VEHICLE. While traveling westbound on East Broad Street at the cross street of Buckeye Boulevard, Pataskala, Ohio, Licking County Sheriff's Office deputies initiated a felony stop on

the TARGET VEHICLE. During the course of clearing the TARGET VEHICLE, a deputy observed a blue drawstring bag sitting on the left rear passenger seat. The bag was open, and the deputy saw clear taped packages believed to be bulk amounts of narcotics.

20. A deputy deployed his state-certified narcotics K9, Nova, to conduct an open-air sniff on the vehicle. The K9 indicated a positive alert for the presence of narcotics on the driver's side of the TARGET VEHICLE.

21. During the subsequent search of the vehicle, deputies recovered the four bundles of suspected heroin from the blue drawstring bag in the backseat. Preliminary testing indicated that the substances are positive for the presence of heroin. Two cell phones (identified as **DEVICE 1** and **DEVICE 2)** were also recovered from the TARGET VEHICLE. RODRIGUEZ was placed under arrest for violation of Ohio Revised Code § 2925.03 (Trafficking in Drugs) and transported to the Licking County Jail.

22. On August 6, 2024, **RODRIGUEZ** was charged by federal complaint in the Southern District of Ohio in Case No. 2:24 mj 00378, with possession with intent to distribute a controlled substance, namely, heroin, in violation of 21 United States Code, §§ 841 (a)(1) and (b)(1)(C).

22. **DEVICE 1** and **DEVICE 2** are currently in the lawful possession of the Homeland Security Investigations Columbus, Ohio, which is within the Southern District of Ohio. **DEVICE 1** and **DEVICE 2** were seized incident to arrest and turned over to HSI upon adoption of the case. **DEVICES 1** and **2** are currently in storage at the HSI Field office in Columbus, Ohio. In my training and experience, I know that **DEVICE 1** and **DEVICE 2** have been stored in a manner in

which the contents are, to the extent material to this investigation, in substantially the same state as they were when **DEVICE 1** and **DEVICE 2** first came into possession of law enforcement.

23. I submit that there is probable cause to believe that **DEVICE 1** and **DEVICE 2** may contain evidence identifying: (1) cellular telephone numbers used by drug-trafficking associates; (2) telephone calls conducted with drug-trafficking co-conspirators (to include time, date, and duration of calls); (3) photographs of and/or with drug-trafficking co-conspirators, illegal controlled substances, and/or currency; (4) text and/or voicemail message communications (including time and date) with drug-trafficking associates; (5) electronic mail and social media internet sites accessed by the users of the devices; and (6) usernames and/or passwords utilized by the users of the devices to access electronic mail and social media internet sites.

24. Based on my training and experience, as well as the training and experience of other law enforcement officers participating in this investigation, I know that drug trafficking organizations utilize cellular telephones (such as **DEVICE 1** and **DEVICE 2**) to communicate when conducting their illegal activity, utilizing the voice, text, and electronic mail (if accessible) functions of the cellular telephone to do so. These devices are utilized in furtherance of the crime by coordinating the transport and distribution of controlled substances, the collection and movement of currency, as well as communicating with members of the drug trafficking organization about the specific operations of that organization.

25. Through my training and experience, I know drug trafficking organizations commonly use electronic devices, cellular telephones, and radio telephones in attempts to maintain secure communications between network members and customers. They use these devices during the commission of their criminal activity and the events preceding and following such activity for the following reasons:

a) They use cellular telephones to arrange, coordinate, and monitor smuggling activities including communicating with other smugglers, arrangers, and other transporters/drivers to coordinate narcotics loads. They also use cellular telephones to communicate with these same individuals during counter surveillance activities, and to warn co-conspirators of the presence of law enforcement or other obstacles to their smuggling plans.

b) They use cellular telephones to contact financial institutions where they launder their proceeds or receive monies for payment for their role in the scheme, as well as to contact individuals who sell/rent real estate, vehicles, or other facilities the smuggler uses in the course of their illegal activities.

c) They use all the communication technologies available within the particular cellular telephone, including voice messaging, texting, audio communications, direct dial, push-to-talk, email, internet access, communication applications, encrypted communications, photo and video images, and contact lists containing information about their criminal associates to accomplish their illicit activities.

d) They use multiple cellular telephones and often change cellular telephones to avoid detection by law enforcement.

26. Further, based on my training and experience, as well as the training and experience of other law enforcement officers participating in this investigation, I know that individual members of DTOs often carry and utilize more than one cell phone per person at a time. It is common practice for these individuals to use different phones to communicate with different members of the drug organization. This helps insulate individuals from being linked to the greater conspiracy if one member is caught by law enforcement. Additionally, when communicating with

drug trafficking organizations based in Mexico, it is common to see phones or SIM cards that are solely used to communicate with the individuals in Mexico, and phones or SIM cards solely used to communicate with individuals in the United States.

## TECHNICAL TERMS

27. Based on my training and experience, I use the following technical terms to convey the following meanings:

   a. Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system (GPS) technology for determining the location of the device.

   b. Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually

be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c. GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The GPS consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

28. Based on my training, experience, and research, I know that these devices have capabilities that allow them to serve as a wireless telephone, digital camera, and GPS navigation device. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

**ELECTRONIC STORAGE AND FORENSIC ANALYSIS**

29. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

30. *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how **DEVICE 1** and **DEVICE 2** were used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on **DEVICE 1** and **DEVICE 2** because:

   a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

   b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

   c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

   d. The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process.

    Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a device is evidence may depend on other information stored on the device and the application of knowledge about how a device behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

    e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

31. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of **DEVICE 1** and **DEVICE 2** consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

32. *Manner of execution.* Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

//

//

//

//

//

## CONCLUSION

33. I submit that this affidavit supports probable cause for a search warrant authorizing the examination of **DEVICE 1** and **DEVICE 2** described in Attachment A to seek the items described in Attachment B.

Respectfully submitted,

BRANDON G EDWARDS
Digitally signed by BRANDON G EDWARDS
Date: 2024.11.20 13:30:29 -05'00'

Brandon G. Edwards
Special Agent
Homeland Security Investigations

Subscribed and sworn to before me
on November 20, 2024:

Kimberly A. Jolson
United States Magistrate Judge